# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDRE KENNETH STUCKEY,<br><br>    Plaintiff,<br><br>v.<br><br>J. JUAREZ, et al.,<br><br>    Defendants. | Case No. 1:18-cv-01557-SAB (PC)<br><br>ORDER DIRECTING CLERK OF COURT TO RANDOMLY ASSIGN A DISTRICT JUDGE TO THIS ACTION<br><br>FINDINGS AND RECOMMENDATION RECOMMENDING DISMISSAL OF CERTAIN CLAIMS<br><br>(ECF No. 15)<br><br>**THIRTY DAY DEADLINE** |

Plaintiff Andrew Kenneth Stuckey is appearing *pro se* and *in forma pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983. The Court screened Plaintiff's two previously filed complaints, and granted Plaintiff leave to either file a second amended complaint or notify the Court of Plaintiff's intent to proceed on the claim the Court found to be cognizable. (ECF Nos. 12, 14.) Currently before the Court is Plaintiff's second amended complaint filed June 7, 2019. (ECF No. 15.)

## I.

## SCREENING REQUIREMENT

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity. 28 U.S.C. § 1915A(a).

1

The Court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally "frivolous or malicious," that "fail[] to state a claim on which relief may be granted," or that "seek[] monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . ." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). Moreover, Plaintiff must demonstrate that each defendant personally participated in the deprivation of Plaintiff's rights. Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002).

Prisoners proceeding *pro se* in civil rights actions are entitled to have their pleadings liberally construed and to have any doubt resolved in their favor. Wilhelm v. Rotman, 680 F.3d 1113, 1121 (9th Cir. 2012) (citations omitted). To survive screening, Plaintiff's claims must be facially plausible, which requires sufficient factual detail to allow the Court to reasonably infer that each named defendant is liable for the misconduct alleged. Iqbal, 556 U.S. at 678-79; Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009). The "sheer possibility that a defendant has acted unlawfully" is not sufficient, and "facts that are 'merely consistent with' a defendant's liability" fall short of satisfying the plausibility standard. Iqbal, 556 U.S. at 678; Moss, 572 F.3d at 969.

## II.

## ALLEGATIONS IN THE SECOND AMENDED COMPLAINT

The Court accepts Plaintiff's allegations in the complaint as true only for the purpose of the *sua sponte* screening requirement under 28 U.S.C. § 1915.

Plaintiff is in the custody of the California Department of Corrections and Rehabilitation ("CDCR") and is currently housed at Pelican Bay State Prison. Plaintiff brings this action against the following Defendants: (1) Sergeant J. Juarez ("Juarez"); (2) Sergeant J. Pereira ("Pereira"); (3) Sergeant Peacock ("Peacock"); (4) Lieutenant Chanelo ("Chanelo"); (5) Officer T. Reyna ("Reyna"); (6) Officer J. Fernandez ("Fernandez"); (7) Officer J. Velasquez

("Velasquez"); (8) Officer Schlichting ("Schlichting"); (9) Officer I. Maldonado ("Maldonado"); (10) Officer Marquez ("Marquez"); (11) Officer Salcedo ("Salcedo"); (12) Officer Gaddis ("Gaddis"); (13) Officer Tafoya ("Tafoya"); (14) Nurse Vitto ("Vitto"); (15) Nurse Palomino ("Palomino"); and 16) Doctor I. Patel ("Patel"). All Defendants are alleged to have been employees at Kern Valley State Prison ("KVSP") at the time relevant to this complaint. The incidents alleged in the complaint occurred while Plaintiff was housed at KVSP.

### A. Plaintiff's Deliberate Indifference Claim for Failure to Protect

In summary, Plaintiff argues that Defendants Juarez, Pereira, Maldonado, Reyna, Velasquez, Fernandez, and Schlichting failed to secure the yard during a "code 1" alarm and allowed Inmate Andre Poumele ("Inmate Poumele") to get up from the prone position without shooting him, and watched as he ran at least sixty (60) feet to where Plaintiff was laying, and watched as Inmate Poumele attacked Plaintiff without a single shot being fired. Plaintiff argues these Defendants disregarded yard policies and failed to neutralize Inmate Poumele, allowing the attack to continue.

Prior to the attack, KVSP's yard policy required inmates to go in the prone position when there is a disturbance in the yard, and Plaintiff states that any inmate that refuses will be seen as the aggressor and immediately shot without warning and each building had a sign stating no warning shot will be fired. Plaintiff highlights that 2014 was a very violent year at KVSP in terms of race-based conflicts, disturbances, and riots, with many race-based conflicts occurring in the large recreation yard. Plaintiff alleges Defendants Juarez, Pereira, Maldonado, Reyna, Velasquez, Fernandez, and Schlichting were on scene for most or all of the race-based incidents that had occurred in the recreation yard.

On October 22, 2014, an inmate named Joey Maiava ("Inmate Maiava") rushed into the dining hall office and slammed the door behind him. An Officer Armenta gave a verbal order for Inmate Maiava to get out of the office, and the inmate responded: "I cant [sic] those motherfuckers are trying to kill me."[1] Inmate Maiava, who Plaintiff identifies as Samoan,

---

[1] When quoting Plaintiff's complaint, the Court may alter the capitalization herein for ease of reading.

3

pointed at two black inmates who were in the area. Kitchen cook Armenta again ordered Inmate Maiava to get out of the office. Inmate Maiava repeatedly said he couldn't because the other inmates were going to stab him.

An Officer Nuno then attempted to enter the office but Inmate Maiava was holding the door shut. Kitchen cook Armenta activated her personal alarm. Officer Nuno forced his way into the office and tried to restrain Inmate Maiava who resisted. Responding Officers Cortina, Campas, and Bennet arrived to assist Officer Nuno in applying restraints to Inmate Maiava who then became combative and started yelling "they're trying to kill me," and the officers then forced Inmate Maiava to the ground where they placed restraints on him. While conducting a body search, officers found a weapon and narcotics. Plaintiff alleges that officers Cortina, Campas, Bennett, and kitchen cook Armenta then realized this was a race-based conflict.

Defendant Juarez and then Pereira arrived and were informed of the incident. Plaintiff claims at this point, Juarez and Pereira were aware that the incident was a race-based conflict. Defendant Juarez instructed officers P. Marin and S. Ochoa to escort Inmate Maiava to the A-yard program office through the recreation yard. While escorting Inmate Maiava, all of the inmates in the recreational yard were in the prone position in the grass. "Plaintiff, who is black, was located in the 'black' area in front of the Building Four." "Inmate Poumele, who is Samoan (other), was located in the 'other' area in between Building Two (2) and Building Three (3)." Plaintiff states there was a sixty (60) to eighty (80) yard distance between him and Inmate Poumele. Juarez and Pereira watched as officers P. Marin and S. Ochoa escorted Inmate Maiava through an area in the yard between where Plaintiff and Inmate Poumele was laying. Plaintiff alleges Defendants Juarez and Pereira failed to instruct Defendants Maldonado, Reyna, Velasquez, Fernandez, and Schlichting to secure the area between the black inmates and other inmates, despite their personal knowledge of the large number of race-based conflicts in the recreational yard in 2014.

While being escorted through the yard, Inmate Maiava yelled something in his native language to Inmate Poumele, who got up from the prone position and ran toward Plaintiff. At this point Plaintiff alleges that "none of the Defendants ordered Inmate Poumele to get down;

4

and they did not shoot or try to neutralize him." (ECF No. 15 at 10.)[2] Plaintiff was laying in the prone position with his back to Inmate Poumele who ran approximately sixty (60) to eighty (80) yards to where Plaintiff was laying and cut Plaintiff's head three times with an inmate manufactured weapon which appeared to be a razor blade with a string forming a makeshift handle. Plaintiff states the attack lasted approximately thirty to forty seconds. Plaintiff alleges none of the Defendants attempted to stop Inmate Poumele as he ran and attacked Plaintiff and that they all just watched in a passive manner while the attack continued for thirty to forty seconds. Plaintiff claims the Defendants had the ability to protect Plaintiff while being attacked, but they "chose not to" by not utilizing their weapons. Plaintiff emphasizes that thirty to forty seconds was more than enough time for Defendants to deploy weapons, but "they just stood there, idle, and did nothing but watch the attack." Plaintiff argues that regardless of whether Defendants knew it was a race-based conflict, the fact that he was being attacked for thirty to forty seconds only 10-20 yards from where they were standing would have put any officer on notice to deploy weapons, even without supervisory instructions.[3]

After the other black inmates witnessed the attack for thirty to forty seconds without officer intervention, they jumped up to protect Plaintiff. Plaintiff states it was only at this point that Juarez announced a "code two" on the radio instructing the officers to form a skirmish line, and then Pereira instructed the officers to move forward toward the rioting inmates. Then, Inmate Bautista witnessed "Inmate Poumele being neutralized by several black inmates," and got up from the prone position to help Poumele. It was only then that Defendants Maldonado, Reyna, Velasquez, Schlichting, and Fernandez began to deploy their weapons. Juarez then announced a code three on the radio.

Defendant Maldonado used a non-lethal weapon (40mm multi-launcher) aimed at the right thigh area of a black inmate named Ellis, but did not aim at the aggressor of the situation, Inmate Poumele. Defendant Maldonado was fifteen feet away from the fight scene between

---

[2] In the originally filed complaint, Plaintiff stated the Defendants did in fact yell to get down at this point, a discrepancy addressed in the Court's previous screening order as discussed below, infra Section III(A)(2).

[3] The description of the attack as lasting thirty to forty seconds is a fact not included in the previously filed complaints, a fact which Plaintiff now repeatedly emphasizes in the second amended complaint.

5

Inmate Poumele and the black inmates. Defendant Reyna used another non-lethal weapon (MK-9 foam solution canister) and aimed at the neck and head area of two black inmates named Ellis and Crathin, bit did not aim at Inmate Poumele. Schlichting, Velasquez, and Fernandez, who were twenty feet away from the fight scene between Inmate Poumele, Bautista, and the black inmates, used CN tactical grenades and tossed them in the area of the fight scene. The force from the weapons "had the desired effect" and caused the black inmates to separate from Inmate Poumele and Bautista "who all proned out in the grass." The officers then performed a "cuff and cover restraint sweep" on "all involved and non-involved" inmates in the yard and dining area.

At approximately 9:45 a.m., the Investigative Services Unit ("ISU"), inclusive of Defendants Chanelo, Peacock, Gaddis, Tafoya, and Marquez, arrived at the scene. Chanelo, Gaddis, and Tafoya established a perimeter around the area with yellow crime scene tape. Chanelo and Gaddis identified evidentiary items by placing yellow evidence markers next to each item. Chanelo photographed the crime scene and all inmates identified as being involved in the altercation. Tafoya assisted Chanelo by collecting evidentiary items, and upon completion, Chanelo returned to the ISU office where he downloaded digital photographs to the ISU evidence computer. Chanelo copied the photographs to a blank CD-R, and secured the evidence into the ISU room. Defendant Tafoya returned to the ISU office to process photos and other evidence. During the processing of the crime scene, a weapon consisting of a razor blade and string handle was found, which is the same weapon that Plaintiff saw Inmate Poumele with when he attacked Plaintiff.

Plaintiff informed Defendants Chanelo, Peacock, Salcedo, Marquez, Gaddis, and Tafoya that he had been cut in the head three times, however Plaintiff states they failed to interview him as to the exact cause of the injuries and failed to inquire as to who the attacker was. Plaintiff notes that Samoan Inmate Poumele was interviewed as to the exact cause of his injuries and who injured him. Inmate Maiava and Inmate Poumele were charged with rules violations for possession of a weapon. Inmates Thomas and Talley were charged with battery on an inmate. All other inmates, including Plaintiff, were charged with participation in a riot, and Plaintiff was found not guilty of such charge on December 2, 2014.

Plaintiff states that all of the Defendants named above were deliberately indifferent to Plaintiff's safety, resulting in his injuries.

**B.     Plaintiff's Claim for Deliberate Indifference Relating to Medical Injuries**

Plaintiff claims that Defendants Vitto, Palomino, nurses in the prison, and Defendant Patel, a doctor, were deliberately indifferent to Plaintiff's injuries, refused to refer him to a doctor trained in dealing with head injuries, and delayed his head x-rays for a year after they were ordered by another doctor. Along with other medical staff, Vitto and Palomino responded to the incident at approximately 9:50 a.m. and completed medical reports for all involved inmates. Defendant Vitto documented Plaintiff's head injuries on the medical report. At this point Plaintiff had blood streaming from his injuries, was experiencing pain in his head. Vitto notified Palomino of Plaintiff's head injuries, and Plaintiff states he notified "Defendants" that he was experiencing severe head pain. Plaintiff asked Vitto and Palomino if they could refer him to a doctor so his head wounds could be evaluated, but Vitto and Palomino refused to refer Plaintiff to a doctor.

Between October 22, 2014, and November 2, 2014, Plaintiff submitted several medical sick call request slips stating that he was experiencing head pain. Between these dates, Plaintiff met with Palomino and notified her that he was experiencing severe pain and asked her to refer him to a doctor who could evaluate the head injuries.

On November 3, 2014, Plaintiff was "finally referred" to a doctor by another nurse named B. John. From November 3, 2014 to November 19, 2014, Plaintiff continuously complained of severe head pains to Palomino and nurse B. John. Plaintiff explicitly states B John is not named as a party.

On November 20, 2014, Plaintiff "finally received" an x-ray of his skull from Doctor Akanno. On November 25, 2014, Doctor Akanno scheduled an x-ray skull exam follow-up so Plaintiff could get a CAT scan to see if he had an occult fracture or intracranial injuries. Plaintiff also explicitly states Doctor Akanno is not named as a party in his lawsuit.

In December of 2014, Plaintiff was moved to the B-yard in KVSP and Defendant Patel was the doctor assigned to this yard. Plaintiff states Patel was in charge of following up on any

previous orders by other doctors. From November 29, 2014, to May of 2016, Plaintiff met with Patel several times notifying him that he was experiencing severe head pains and that he needed to receive a CAT scan so he could determine if he had an occult fracture or intracranial injury, which Plaintiff claims was ordered by Doctor Akanno. Plaintiff claims Patel refused to follow up on Doctor Akanno's previous order and refused to schedule the CAT scan. To this date, Plaintiff has not received the CAT scan, and still suffers head pains ranging from "migraines to feelings he can't explain."

### C. Plaintiff's Equal Protection Claim

Plaintiff claims that Defendants Chanelo and Peacock violated Plaintiff's equal protection rights when they ordered all the black inmates, including Plaintiff, to be strip-searched and ordered all of their personal clothing and property to be destroyed, while they did not strip-search the other inmates, including Inmates Maiava, Poumele, and Bautista, and allowed them to keep their personal clothing and property, rather than taking the items for evidence. Plaintiff claims the discriminatory effect and intent of Defendants Chanelo and Peacock violated Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment.

### D. Relief Requested

Plaintiff requests a jury trial and is seeking compensatory damages in the amount of $1,000,000.00, and punitive damages in the amount of $1,000,000.00.

## III.

## DISCUSSION

### A. Plaintiff's Deliberate Indifference Claim for Failure to Protect

Plaintiff argues that Defendants Juarez, Pereira, Reyna, Fernandez, Velasquez, Maldonado, Schlichting, Chanelo, Peacock, Salcedo, Marquez, Gaddis, and Tafoya, were deliberately indifferent to Plaintiff's safety, resulting in his injuries that occurred during the riot.

Prison officials have a duty under the Eighth Amendment to protect prisoners from violence at the hands of other prisoners as "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." Farmer v. Brennan, 511 U.S. 825, 833-34 (1994) (internal citations and quotation marks omitted); see also

Cortez v. Skol, 776 F.3d 1046, 1050 (9th Cir. 2015); Clem v. Lomeli, 566 F.3d 1177, 1181 (9th Cir. 2009); Hearns v. Terhune, 413 F.3d 1036, 1040 (9th Cir. 2005). However, prison officials are liable under the Eighth Amendment only if they demonstrate deliberate indifference to conditions posing a substantial risk of serious harm to an inmate. Farmer, 511 U.S. at 842; Clem, 566 F.3d at 1181.

Deliberate indifference is a high legal standard, under which "the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" Toguchi v. Chung, 391 F.3d 1051, 1057, 1060 (9th Cir. 2004) (quoting Farmer, 511 U.S. at 837). "If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk." Id. (quoting Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1188 (9th Cir. 2002)). Deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" Farmer, 511 U.S. at 835 (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)). It is well settled that deliberate indifference occurs when an official acted or failed to act despite his knowledge of a substantial risk of serious harm. Farmer, 511 U.S. at 842; Clem, 566 F.3d at 1181.

### 1. Defendants Juarez and Pereira

Plaintiff states that following the incident in the dining hall, the officers, not named in this action, "then realized this was a race-based conflict." Defendants Juarez and Pereira arrived on the scene, were informed of the incident, and "were aware that the incident preceding their arrival was a race-based conflict." Plaintiff claims Defendants Juarez and Pereira then failed to instruct Defendants Maldonado, Reyna, Velasquez, Schlichting, and Fernandez to secure the area between where the black inmates and "other" inmates were laying in the yard while Inmate Maiava was escorted through the yard.

In Plaintiff's amended filings, he emphasizes that prior to the incident, the year 2014 was a very violent year in terms of race-based conflicts, disturbances, and riots, particularly in the large recreation yard, and states that Juarez and Pereira were on scene for most or all of these

race-based conflicts that occurred in the recreation yard prior to the incident. Other than these general statements concerning the year 2014, Plaintiff's statements that the non-party officers "then realized this was a race-based conflict," and that Juarez and Pereira arrived on the scene thereafter and were aware the incident was a racial incident, are the only allegations in the complaint which refer to any knowledge on the part of Juarez and Pereira concerning potential danger to Plaintiff before Inmate Poumele began running across the yard. In Plaintiff's second amended complaint, he also alleges Juarez only announced a code two alarm after the black inmates jumped up to protect Plaintiff, that Pereira then instructed officers to move forward toward the inmates, and that Juarez only announced a code three alarm after weapons were deployed.

These facts are insufficient to demonstrate Juarez or Pereira were aware of any potential danger specific to Plaintiff, let alone anything beyond what might reasonably be expected in a typical prison setting during an incident like the one which was occurring at the time. See, e.g., Hudson v. Palmer, 468 U.S. 517, 526 (1984) ("Prisons, by definition, are places of involuntary confinement of persons who have demonstrated proclivity for antisocial criminal, and often violent, conduct."); Berg v. Kincheloe, 794 F.2d 457, 461 (9th Cir. 1986) (observing prison environment is "at best, tense[.]" "sometimes explosive," and "always potentially dangerous."). The mere fact that Inmate Maiava was involved in a racial incident occurring between inmates that did not directly involve the Plaintiff, in a different part of the prison where Plaintiff was located, is insufficient to demonstrate that these Defendants knew of a substantial risk to Plaintiff's safety, let alone to extrapolate that they knowingly and purposely disregarded the fact that Plaintiff was in significant danger. This is particularly true considering that when Inmate Maiava was escorted through the yard, prison officials had in fact ordered all inmates to lay down in the prone position for safety reasons, and thus appear to have been taking reasonable measures to ensure the safety of all inmates in the area, including Plaintiff. The additional facts in Plaintiff's second amended complaint regarding the timing of when Juarez announced the alarms, do not demonstrate that Defendants were deliberately indifferent to Plaintiff's safety, but rather demonstrate the officers were responding to a chaotic riot situation and taking reasonable

steps to maintain control through coordinated tactics between the team of officers as the situation became more violent.

For these reasons, Plaintiff fails to state a claim against Defendants Juarez and Pereira for deliberate indifference.

### 2. Defendants Maldonado, Reyna, Velasquez, Fernandez, and Schlichting

Next, while Inmate Maiava was being escorted from the dining area through the yard, Plaintiff claims that Defendants Maldonado, Reyna, Velasquez, Fernandez, and Schlichting witnessed Inmate Poumele get up from the prone position, run into the black area, and begin attacking Plaintiff.

In the originally filed complaint, Plaintiff stated: "when the Defendants Maldonado, Reyna, Velasquez[,] Fernandez, and Schlichting witnessed the Inmate Poumele get up from the prone position and run to the 'black' area, they yelled 'get down' but did <u>not</u> deploy or utilize their weapons immediately." (ECF No. 1 at 8 (emphasis in original).) In Plaintiff's first amended complaint, Plaintiff changed this detail and stated: "<u>none</u> of the Defendants ordered Inmate Poumele to get down, and they did <u>not</u> shoot or try to neutralize him." (ECF No. 13 at 9 (emphasis in original).) In the first amended complaint, Plaintiff also alleged that "<u>none</u> of the Defendants attempted to stop Inmate Poumele as he ran and attacked" Plaintiff, and that "<u>all</u> of the Defendant[s] just watched the attack in a passive manner." (ECF No. 13 at 9 (emphasis in original).) Plaintiff's first amended complaint also added the following details, which remain in the second amended complaint: 1) the distance between Plaintiff and Inmate Poumele was approximately 60 to 80 yards prior to the attack; 2) prior to the incident, the year 2014 was a very violent year in terms of race-based conflicts, disturbances, and riots, particularly in the large recreation yard; 3) Maldonado, Reyna, Velasquez, Fernandez, and Schlichting were on scene for most or all of these race-based conflicts that occurred in the recreation yard prior to the incident; and 4) Defendants were aware of the policy that inmates will be shot without warning if they get up from the prone position when a disturbance occurs in the yard.

In the order screening Plaintiff's first amended complaint, noting the omission of the fact that the Defendants yelled for Inmate Poumele to get down, the undersigned informed Plaintiff

that the Court need not accept contradictory allegations as true and notified Plaintiff that if he were to again attempt to amend his complaint, he must cogently explain the inconsistencies in his pleadings regarding these events. (ECF No. 14 at 10-12.) In addressing the Court's concerns regarding the discrepancy, Plaintiff explains the inconsistency was an error "probably caused by the Plaintiff writing too fast, not concentrating, being heavily medicated or a combination of all of these things," and states the second amended complaint is a better depiction of what occurred. (ECF No. 15 at 10.)

Additionally, in the order screening Plaintiff's first amended complaint, the Court explained that the Defendants were responding to a chaotic riot and that as described, the attack on Plaintiff likely occurred in a manner of seconds. (ECF No. 14 at 13.) In the second amended complaint, Plaintiff places additional emphasis on the alleged passive manner that the Defendants acted in during the attack and now repeatedly alleges that the attack lasted thirty to forty seconds while Defendants "just stood there, idle, and did nothing but watch the attack." (ECF No. 15 at 11.) Plaintiff makes the conclusory statement that the Defendants "had the ability to protect the Plaintiff while he was being attacked, but they chose not to, by not deploying or utilizing their weapons during the attack." (Id.) Plaintiff emphasizes that the Defendants were only ten to twenty yards away from where the attack was occurring and that they had knowledge of how to protect Plaintiff. (Id. at 11-12.)

The Court notes that the description of the attack as lasting thirty to forty seconds was not included in the previously filed complaints. Additionally, in the originally filed complaint, Plaintiff stated that he "was in the prone position while Inmate Poumele cut him in the head the first two (2) times then jumped up to defend himself when Poumele cut him the third (3) and final time." (ECF No. 1 at 8.) Such description of the attack was omitted in the amended complaints. Plaintiff still alleges he was only cut three times during the thirty to forty second attack described in the second amended complaint.

The rest of the facts in the second amended complaint are essentially the same as the prior complaints. Plaintiff claims that Defendant Maldonado used a non-lethal weapon aimed at a black inmate named Ellis, but failed to aim at the aggressor, Inmate Poumele. Plaintiff states

that Defendant Reyna used another non-lethal weapon on two black inmates, but failed to aim it at Inmate Poumele. Plaintiff also identifies Officer Schlichting, and Defendants Velasquez and Fernandez as using non-lethal grenades which were thrown into the fight scene.

The Court finds that Plaintiff has failed to demonstrate that any of these Defendants had prior knowledge that Plaintiff was going to be assaulted. The facts demonstrate the officers were taking actions to generally diffuse the situation for all inmates during the riot. According to the complaint, at the time Inmate Maiava was walked through the yard in handcuffs and gave the signal to the other Samoan inmate to attack, the black inmates and Samoan inmates had already been ordered into the prone position and were laying on the ground. Therefore, it appears the prison officials were taking actions to arrest and remove Inmate Maiava from the dining area where the original incident had occurred, and the officers had all inmates on the ground to prevent any further violence. Based on these facts, there is no indication that any Defendants were aware that Plaintiff was specifically in danger from Inmate Maiava nor that that they were deliberately indifferent to such danger prior to Inmate Poumele running at Plaintiff.

As for the actions of the Defendant officers immediately before the attack when Inmate Poumele began running toward Plaintiff and the officers allegedly did not yell to get down, and failed to use their weapons during the initial attack, Plaintiff fails to demonstrate that the Defendants were deliberately indifferent to his safety. In the second amended complaint, Plaintiff makes conclusory and speculative statements attempting to impute knowledge of how to protect Plaintiff to the officers at the time of the attack, and attempting to impute a specific intent to passively watch and allow the attack to continue on the part of the officers. Plaintiff cannot impute such knowledge or intent to the officers involved based on these facts. As described, the circumstances do not demonstrate that officers failed to reasonably take actions to protect Plaintiff during the riot situation. Rather, the facts described only demonstrate that the officers responded to the alarm situation, were ordered into a skirmish line, and deployed their weapons when the situation escalated into a full-blown riot after the black and Samoan inmates collectively got up from the prone position and were fighting each other. Further, the use of the weapons as described demonstrates that the Defendants who fired the weapons were not

13

deliberately disregarding any risk to Plaintiff but were taking appropriate and reasonable measures to handle a chaotic riot situation. Plaintiff's own summary indicates that the collective use of the weapons by these officers, in fact, ended the incident, as Plaintiff states: "the force from the Defendants Schlichting, Velasquez and Fernandez['s] weapons had the desired effects of separating" the fighting inmates, and "all the combatants proned out on the grass."

For these reasons, Plaintiff fails to state a claim against Defendants Maldonado, Reyna, Velasquez, Fernandez, and Schlichting for deliberate indifference.

### 3. Defendants Chanelo, Peacock, Salcedo, Marquez, Gaddis, and Tafoya

As for the remaining Defendants, the only action that Plaintiff identifies pertaining to Defendants Chanelo, Peacock, Salcedo, Marquez, Gaddis, and Tafoya occurred after the attack, where these Defendants were allegedly told by Plaintiff about his head injuries, but failed to interview him about the exact cause of the injuries or inquire as to who the attacker was. Under these alleged facts, none of these Defendants would be liable under the Eighth Amendment as such actions do not demonstrate any action or failure to act despite a substantial risk of serious harm to Plaintiff. See Farmer v. Brennan, 511 U.S. 825, 833-34 (1994); Clem v. Lomeli, 566 F.3d 1177, 1181 (9th Cir. 2009).

In sum, Plaintiff's allegations fail to demonstrate "deliberate indifference" on the part of any named Defendants, and even if Defendants were negligent in failing to protect, mere negligence is insufficient to give rise to a constitutional violation. Accordingly, Plaintiff fails to state a cognizable claim for relief under the Eighth Amendment for deliberate indifference.

**B. Plaintiff's Claim for Failure to Provide Proper Medical Treatment**

To maintain an Eighth Amendment claim based on deliberate indifference regarding prison medical treatment, an inmate must show (1) a serious medical need, and (2) a deliberately indifferent response by defendant. Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006). "A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain," and "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily

activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a serious need for medical treatment." McGuckin v. Smith, 974 F.2d 1050, 1059–60 (9th Cir.1992) (internal quotations and citations omitted), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir.1997) (en banc).

The second prong, a deliberate indifferent response, is met "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Jett, 439 F.3d at 1096. Indifference may be apparent "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." Id. (internal quotations and citation omitted). Deliberate indifference is a high legal standard and medical malpractice or negligence is insufficient to establish a constitutional violation. Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004); Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (noting that the indifference to the medical needs must be substantial, and mere indifference, negligence, or medical malpractice will not suffice to support the cause of action); Estelle v. Gamble, 429 U.S. 97, 106 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). "A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." Snow v. McDaniel, 681 F.3d 978, 988 (9th Cir. 2012) (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989)), overruled on other grounds by Peralta v. Dillard, 744 F.3d 1076 (9th Cir. 2014). Rather, a plaintiff is required to show that the course of treatment selected was "medically unacceptable under the circumstances" and that the defendant "chose this course in conscious disregard of an excessive risk to plaintiff's health." Snow, 681 F.3d at 988 (quoting Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996)).

Here, Plaintiff has failed to allege sufficient factual details demonstrating that any of the Defendants were deliberately indifferent to a serious medical need. Plaintiff states that Vitto responded to the incident and completed a medical report documenting the head injuries, but did not refer him to a physician while on scene after the incident. After Vitto notified the other nurse, Palomino, of the injuries, Plaintiff states he told Vitto and Palomino that he was

experiencing severe head pains, and asked if they would refer him to a doctor for evaluation, but they both refused. At this point in the complaint, Vitto's involvement ends, and Defendant fails to state a claim against Defendant Vitto, as the bare allegation that a medical official allegedly refused to abide by a demand from a patient to see another medical official does not state a claim for deliberate indifference to a medical need. See Snow v. McDaniel, 681 F.3d 978, 988 (9th Cir. 2012).

Then, Plaintiff states between October 22, 2014, and November 2, 2014, he submitted several medical sick call request slips stating he was experiencing head pain, and that between these dates, he met personally with Palomino and notified her about severe pain and asked her to refer him to a doctor to evaluate the head injuries. Plaintiff does not provide any details about how many times he met with Vitto, what dates he met with Vitto, nor whether he received or didn't receive any treatments, diagnoses, or medications. Plaintiff does not even state that Vitto refused to refer him to a doctor during this time, only averring that he was "finally referred" to a doctor by another nurse, B. John, not named as a party. Then Plaintiff states he continuously complained of severe head pains to Palomino and B. John between November 3, 2014, and November 19, 2014, and that on November 20, 2014, he "finally" received an x-ray of his skull from Doctor Akanno. At this point in the complaint, Palomino's involvement ends, and the Court finds that Defendant fails to state a claim against Defendant Palomino. Given the limited factual details concerning these multiple visits with Palomino which Plaintiff failed to cure on amendment, Plaintiff's allegations only show a difference in opinion between the patient and the medical official, and a medical official's alleged refusal to abide by a demand from a patient, without more, does not state a claim for deliberate indifference to a medical need. See Snow v. McDaniel, 681 F.3d 978, 987 (9th Cir. 2012).

Plaintiff states that next, on November 25, 2014, Doctor Akanno scheduled an x-ray skull exam follow-up so that Plaintiff "could get" a CAT scan "to see" if he had an occult fracture or intracranial injury. Plaintiff was then transferred to a different yard in the prison and assigned to a Doctor Patel. Plaintiff states that he met with Patel on several occasions between November 29, 2014, and May of 2016, notifying him that "he was experiencing severe head pains and that

16

he needed to receive a CAT-scan of his head so that he could see if he had a[n] occult fracture or intracranial injury which had been ordered by" Doctor Akanno.  Plaintiff claims that Patel refused to follow up on Doctor Akanno's previous order and refused to schedule Plaintiff for a CAT scan.  First, it is not clear to the Court that Doctor Akanno in fact ordered a CAT scan or whether it was simply discussed as a potentiality during the x-ray exam.  Further, even if it was ordered, Plaintiff does not provide any details about how many times or what dates he met with Patel, nor whether he received or didn't receive any other treatments, diagnoses, or medications.  Plaintiff's allegations, at most, only appear to show a potential difference in opinion between the two doctors, and "[a] difference of opinion . . . between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." Snow, 681 F.3d at 988 (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).

In summary, the facts alleged do not even appear to rise to the level of medical malpractice or negligence, let alone demonstrate any of the Defendants denied, or intentionally interfered with necessary medical treatment, or that the decision was medically unacceptable or chosen with a conscious disregard of an excessive risk to Plaintiff's health.  Snow, 681 F.3d at 988; Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).  Accordingly, Plaintiff fails to state a cognizable claim under the Eighth Amendment against Defendants Vitto, Palomino, and Patel for deliberate indifference to a medical need.

### C. Plaintiff's Claim for Violation of the Equal Protection Clause

Plaintiff also alleges that his equal protection rights were violated.  The Equal Protection Clause of the Fourteenth Amendment requires that persons who are similarly situated be treated alike.  City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439 (1985).  An equal protection claim may be established in two ways.  The first method requires a plaintiff to show that the defendant has intentionally discriminated against the plaintiff on the basis of the plaintiff's membership in a protected class.  Thornton v. City of St. Helens, 425 F.3d 1158, 1167 (9th Cir. 2005); Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir. 2001).  The second requires that Plaintiff have received disparate treatment compared to other similarly situated inmates without a rational basis for that difference in treatment.  Village of Willowbrook v.

1 | Olech, 528 U.S. 562, 564 (2000).

Plaintiff claims that Defendants Chanelo and Peacock violated Plaintiff's equal protection rights when they ordered all the black inmates, including Plaintiff, to be strip-searched and ordered all of their personal clothing and property to be destroyed, while they did not strip-search the other inmates, including Inmates Maiava, Poumele, and Bautista, and allowed those inmates to keep their personal clothing and property, and did not take these items for evidence. .

Plaintiff's allegations, liberally construed, are sufficient to state a cognizable claim against Defendants Chanelo and Peacock for violation of the Equal Protection Clause.

**IV.**

**CONCLUSION AND RECOMMENDATION**

Plaintiff's second amended complaint states a cognizable claim against Defendants Chanelo and Peacock for violation of the Equal Protection Clause of the Fourteenth Amendment. However, Plaintiff fails to state a cognizable claim for deliberate indifference under the Eighth Amendment for failure to protect against Defendants Juarez, Pereira, Maldonado, Reyna, Velasquez, Fernandez, Chanelo, Peacock, Gaddis, Tafoya, Marquez, Salcedo, or Schlichting. Plaintiff also fails to state a claim for deliberate indifference to a medical need under the Eighth Amendment against Defendants Vitto, Palomino, or Patel.

Based upon the allegations in Plaintiff's original, first and second amended complaints, the Court is persuaded that Plaintiff is unable to allege any additional facts that would support a claim for deliberate indifference for a failure to protect during the riot, and for deliberate indifference to a serious medical need, and further amendment would be futile. See Hartmann v. CDCR, 707 F.3d 1114, 1130 (9th Cir. 2013) ("A district court may deny leave to amend when amendment would be futile.") Based on the nature of the deficiencies at issue, the Court finds that further leave to amend is not warranted. Lopez v. Smith, 203 F.3d 1122, 1130 (9th. Cir. 2000); Noll v. Carlson, 809 F.2d 1446-1449 (9th Cir. 1987).

///
///
///

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. This action proceed on Plaintiff's claim of violation of the Equal Protection Clause against Defendants Chanelo and Peacock;
2. Plaintiff's claim for deliberate indifference for failure to protect during the riot be dismissed for failure to state a cognizable claim for relief;
3. Plaintiff's claim for deliberate indifference to a serious medical need be dismissed for failure to state a cognizable claim for relief;
4. The matter be referred back to the undersigned for initiation of service of process; and
5. The Clerk of Court is directed to randomly assign a District Judge to this action.

The Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within **thirty (30) days** after being served with these Findings and Recommendations, Plaintiff may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Plaintiff is advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **July 23, 2019**

UNITED STATES MAGISTRATE JUDGE